Welcome to the Illinois Appellate Court, 1st District, 1st Division. We're going to ask that the lawyers who are going to argue on the first case please step up, introduce themselves, and tell us who you represent. Yasmin Navarro, the Office of the State Appellate Defender, on behalf of Michael Pace. Good morning, Assistant State's Attorney Mary Needham, on behalf of the people of the state of Illinois. All right, thank you, Counsel. Under Illinois Supreme Court Rule 352B, each side would normally have 20 minutes for the main argument. We're going to extend that to about 30, given the number of issues in the case. But please do not feel compelled to use the entire 30 if you really don't need it. The appellate will have 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. Please remember to speak loudly. Our microphones do not amplify very well, but they merely record what is being said. And also, please understand that we have read the briefs and are familiar with the facts of the case, so devote your time to your strongest arguments. Ms. Navarro. May it please this Court, again, my name is Yasmin Navarro of the Office of the State of Illinois, and I'm here to speak on behalf of Michael Pace. Your Honors, Michael Pace has never had a fair hearing, never throughout the proceedings below. It began when Judge Nicholas Ford misinformed this intellectually limited defendant of the applicable sentencing range. It continued at every hearing thereafter when Judge Ford continually demonstrated his bias. Why did he demonstrate his bias? He said continually. That's a pretty strong word. Give me a couple of examples. Sure. I'll begin with the sentencing hearing. His conduct at the sentencing hearing and beyond, acting as a surrogate prosecutor at times. Specifically, what do you mean by that? Sure. In asking questions of Dr. Robert Hanlon at the sentencing hearing, he said that he      was going to see Dr. Gressman at the trial. And Dr. Gressman at the motion to withdraw a guilty plea, he asked questions that were leading in nature, which was interesting because they're typically seen utilized by an opposing party in cross-examining a witness, trying to elicit certain specific, known facts, which the party wants to then utilize in advancing a position. In Dr. Robert Hanlon's case, to get him to refute his assessment of Michael's IQ and learning disability, I'll give you a couple of examples. One question in particular. Alright, now knowing he was a member of the gang over time, and knowing also that he engaged in a complicated effort to execute a person on a bus in the city of Chicago, would these things be inconsistent with the level of disability that you're indicating that he possesses? What's interesting about this question, apart from the fact that it's a leading nature, but it contains prejudgment within it. The fact that the judge is making an assessment that the effort on the behalf of Michael was complicated is showing his prejudgment. But it goes on from there. When Dr. Hanlon continues and says that no, in fact, Michael's disability makes it more and not less likely to join a gang, then the judge forward asks the witness to speculate as to why other people would join a gang, which of course has no relevance whatsoever on sentencing in Michael's case. So, Ms. LaValle, I see you don't like the questions that the judge asked, but is the court able to ask open-ended questions in this phase of the trial? Certainly. The court does have discretion to ask open-ended general questions. If, for example, he was asking, can you describe what a non-verbal learning disorder is? But we rarely see those type of questions from Judge Ford throughout the questioning of either of the two defense experts. Really, is there any limitation now on the kind of questions a judge can ask? Is there a limitation, for instance, that the judge isn't forbidden from asking a leading question? I think what's forbidden about a leading question or what's problematic about a leading question is it betrays, if it's trying, for example, to elicit a specific known fact. And in many instances, Judge Ford was doing just that. He was quizzing, for example, Dr. Grossman as to her qualifications, as to what she had read, when this hearing occurred, when another hearing occurred. And in fact, that does display that would be a problematic question, Your Honor. But typically, what's accepted are open-ended inquiries that are designed at fact-finding. If a leading question were designed at fact-finding, but the very nature of a leading question kind of refutes that fact-finding impartiality, and that's the problem with the leading question. With Dr. Grossman, there were questions, for example, that chastised her for not answering a simple question, a quote-unquote simple question. And in fact, if you look at the transcript, she had just answered that question moments before, but obviously not to the liking of Judge Ford. It's also evident in the way that Judge Ford interrupted Dr. Grossman multiple times as she was trying to answer those questions. And again, when he quizzed her, as I mentioned, about her expertise, about her prior testimony in other cases, that's interesting because the parties had only stipulated to her qualifications as an expert, so it was not uncovering any facts per se. But Judge Ford's conduct did not just end with the quizzing of the prosecutors. He explicitly indicated at the sentencing hearing that he would be relying on his personal beliefs on a number of things. For example, he referenced the wider epidemic of gang violence within our society. He talked about newspaper headlines that greet him each morning. And he talked about Michael's quote-unquote not uncommon disability. Ms. DeValle, you argue very vociferously about Judge Ford's comments during sentencing. And one thing that struck me when I started this job was how many appeals I get based on a judge's comments during sentencing. And it almost seems like, you know, the best thing is to say nothing, other than I've considered everything I'm allowed to consider, and I haven't considered anything I'm not allowed to consider, and literally in those sentences, the judge is going to get an objection based on error, and we have to deal with it. But, you know, the question is, where do we draw the line? How much leeway do we give the judge in terms of expressing what are, you know, what is the legislative intent really behind these sentencing laws? Certainly. I understand your concern, Justice DeValle. But the types of questioning, for example, or the statements, I'm sorry, let me specify that the statements that we get, it's not one off-handed comment here and there, a reference, it's continual. It is the bulk of the sentencing comments. These remarks span 16 pages, and I didn't take a tally, but I would dare say that the majority of these comments were these improper comments. They were comments about, as I said, his not uncommon disability. We draw the line there when he's referencing outside, unverified statistics about people with Michael's disability. Allegedly going on to secondary and tertiary education, when there's no evidence about it at all. That would be crossing the line and being improper, Justice DeValle. He also goes on to make comments about how he's very tired of watching doctors, psychologists walk into his courtroom. And in this way, it's really reminiscent of the type of comments that he made in People v. Charles Jackson, which I know you all are intimately aware. What's notable about Charles Jackson is that the proceedings in that case ended just four short days prior to the commencement of the guilty plea proceedings in Michael's case. In that case, similar to the questions that he asked of Dr. Grossman and Dr. Hanlon, he would ask Dr. Frumkin if certain behaviors on the part of the defendant there, his fearfulness of the victim and his confederate gang involvement refuted their assessment of him being, of the doctor's assessment of him being not cogent or insane at the time of the offense. Ms. DeValle, if we disagree with you about vacating the guilty plea, but are favorably inclined on the sentencing issue in some aspect, and send it to a new judge is what you're requesting, do we start all over again with the doctors, or is the new judge going to just go on the transcripts? What are you actually requesting? We would be requesting a full sentencing transcript, I believe that's what the law entitles him to, where certainly Dr. Hanlon could testify again. And of course, you have to remember that the PSI in this case is from 2009. Not only has the law significantly developed in our understanding of sentencing juveniles, but there are factors that need to be taken into consideration now. So just looking at the cold transcripts would not be enough. But to speak to your point about that, I'd like to back up a little bit to the guilty plea proceedings, because Judge Frumkin's errors did not just begin at the sentencing hearing. Fifty-seven years. That was the mandatory minimum that Markle faced pursuant to his non-negotiated plea. So Ms. Nevaeh, assuming also we do not vacate the guilty plea, what we're dealing with here is the difference between 57 years and 100 years, is that correct? We are dealing with a first-time juvenile defendant with a low IQ who was never convicted. And assuming constitutionality of everything. Correct. Ms. Nevaeh, your client fired into a bus full of people. He killed one person and shot two other. I don't want that to get lost in the mix, because you're kind of glossing right over that and talking about an impaired juvenile. You know, I want you to be aware that that's of importance to me as well. Just keep that in mind. I certainly keep that in mind, Justice Cunningham, and I understand your concern. We have from the very beginning called this crime reprehensible. Nobody would dispute that. But it is equally true that Michael and all defendants, but particularly Michael, we can't forget that he committed this crime at the age of 16, and that his IQ was placed below 94% of his peers. And in fact, if we go back to 1999 and 2004, his IQ made him presumptively disabled under Illinois law. So that is of utmost importance, and that the understanding of the defendant that the guilty prophecy is. Just to return to your comment, Justice DeLoy, I think I didn't understand. Certainly, we would be saying that the minimum could be 57, but it's within your discretion, Your Honors, or within your powers to find that the mandatory add-on as applied to Michael were unconstitutional. My question was very simple. Under the presumption that everything was constitutional. Oh, I'm sorry. Under the presumption 57 would be correct, the minimum. Yes, I'd like to return to the guilty plea proceedings. 57 years was the two words that were never uttered throughout these guilty plea proceedings to Michael. In all 22 pages of the guilty plea proceedings, Michael was never once told. He was also never once told about consecutive sentences. And therefore, he was led to believe that he could get a sentence of either 20 or 25 years. And the judge did this by having Michael plead guilty to two counts of first-degree murder for the death of Blair Holt, one individual. And here's my concern on that issue. You're in front of a judge, and the judge says you're charged with two crimes. You can get up to 20 for crime A, and you can get up to 15 for crime B. Correct. The words consecutive and concurrent are never mentioned. And you're asking us to presume what was in his head that he assumed it was 20, because they would somehow combine and be concurrent. Isn't that what you're arguing? No, not at all, Your Honor. I think what's clear is, first of all, let me back up, thinking that the minimum might be 20 or 25 years, which the judge did instruct this defendant to do, it's very likely that a defendant, even the most able, intellectually adult, thinking that he could get 20 or 25 years by pleading guilty. That's a major problem. But we're not asking you to assume. In fact, based upon Michael's interviews with Dr. Henry, he indicated that he believed that he could get a sentence as low as 25, and his motion to withdraw, his pro se motion to withdraw guilty plea, indicates that he was led to believe that he would get a sentence considerably lower. And there is no assumption. Does that say who led him to believe that? Was it an incompetent attorney? It's hard to believe someone on the murder task force in the PD's office would not know that. It is quite problematic that the APD below did not allege that the mandatory minimum. I mean, it's clear on the face of this case that the judge is saying that's what he understood. But there's never any kind of Strickland hearing where some public defender took the stand and fell on her sword or his sword and said, oh, no, I screwed up. I told him what was going to be concurrent. Correct. But those are two different arguments. One would be an effective assistance of counsel, because my counsel didn't convey the proper sentence in range, but the admonitions were otherwise proper. But we're dealing with the admonitions in court. That is an entirely separate consideration of what the defendant was told before or by his attorney whatsoever. There is still a fundamental duty on the part of the judge to properly advise the defendant of the minimum and the maximum. And there's a reason that the minimum is important. Are you suggesting that we should establish a rule that in every case where a judge takes a guilty plea, the judge has to express explicitly whether it's concurrent or consecutive and announce the maximum aggregate sentence that could be imposed upon a guilty finding for every crime for which the person is charged? I don't think that's a rule we would be asking you to say. That's a rule that exists. They must inform the defendant pursuant to ANS Supreme Court Rule 402 of the minimum sentence the defendant faces. It's usually done crime by crime rather than in the aggregate, though, isn't it, in the real world? That's the problem here. When he does it, in fact, he does it in extraordinary fashion. I mean, having a defendant guilty to two counts of first-degree murder for the murder of one individual just doesn't make sense whatsoever. He's never told. I'd like the answer to Justice Szilard's question. And the question is, are you suggesting that we establish a rule that the trial judge is now going to be required to state the aggregate for all of the crimes to which the defendant is pleading guilty? Is that what you're asking us to do? I would be saying yes in a case such as this. We can't establish a rule for one case. It's either the rule or it's not the rule. I'm asking you, you know, we have to write something. What is it that you want us to write to address that issue as you see it? I would say that you could write that this defendant was not told about the mandatory minimum. And the mandatory minimum in this case took into – So are you asking us to establish a rule that the judge must announce the aggregate amount of the sentence for every crime to which the defendant has pled guilty? That's a yes or no question. I would be saying no, because that is a rule that exists. I'm not asking you to expand Illinois law. You would be applying Rule 402 in this case. And that is, a defendant needs to know that the mandatory minimum he faces is not 20, is not 25, is actually 57 years. Otherwise, that renders a nullity the requirement of Rule 402. Well, you haven't answered my question, but that's all right. Let's move along. I'm sorry. I thought I did. No would be the answer. There is no new law that needs to be drafted. So you want him to be able to withdraw his plea? Principally, yes. That is – New trial? Potentially, yes. We don't know what lay in hold. In the face of all the videotape that I have seen described, where would you be going with a new trial? You know, Justice Harris – As opposed to us just sending it back for resentencing, assuming we buy your pitch. Of course. Justice Harris, I think those considerations at this point are just simply premature. Michael has never once had a fair hearing before this Court. Beginning with the court's errors, he was never properly admonished. We cannot be asking for a new sentencing hearing in this matter. At the very least, because of Judge Forbes' behavior at the sentencing hearing. Ms. Devine, you only have about five minutes left.   I would like to ask you a question. I have only five minutes left, so let me make sure we don't gloss over the constitutional issues. We've been living in this world of rapid change in terms of constitutional laws applied to juvenile crime. There's one thing we can't do here, and we can't disobey the Illinois Supreme Court. How do you get around Patterson? I don't think we need to get around Patterson. As far as the facial challenges, Your Honor, we readily accept and concede that those are decided by Patterson. However, this Court has, as applied, or we have argued before this Court, as applied challenges on both the juvenile transfer and also, as in the supplemental brief, as to the mandatory consecutive sentence scheme and the firearm add-on. And I think, actually, people of the Illinois Supreme Court, and I think Romar Gibson speaks to that, and Clemens, and the Illinois Proportionate Penalties Clause allows this Court to provide, gives us greater freedoms than, in fact, or greater protections, gives a defendant greater protections. The principal goal is restoring a defendant to useful citizenship. That's of primary importance, not only in the Eighth Amendment, but in our Illinois Proportionate Penalties Clause. And I don't think Patterson forecloses any of those challenges. In fact, Romar Gibson suggested as such. So would you agree that, again, pointing the finger up to the 20th floor, that the Illinois Supreme Court has basically said the Illinois Proportionate Penalties Clause is coextensive with federal constitutional rights, and therefore doesn't have an independent existence, so to speak, that allows us to use it throughout the lockstep doctrine and use it for what you're suggesting? I think this is where people of the Clemens and people of the Romar Gibson, the analysis in both those cases, but particularly Romar Gibson, the analysis is, yes, they are lockstep in the sense that they both deal with penalties, per se. But what is not lockstep is the fact that the Illinois Proportionate Penalties Clause is more expansive. It has, of primary importance, the goal of returning an individual to useful citizenship. A 100-year sentence in this case doesn't have rehabilitation as its goal. Beyond the fact that Judge Ford inappropriately indicated that his sentence serves two masters, retribution and deterrence, by its very nature, a 100-year sentence does not enable a defendant like Michael who has a greater capacity to be restored to useful citizenship to, in fact, be rehabilitated and be a contributing member of society. So it determines that. Doesn't the trial judge get to determine whether or not he has rehabilitative potential? Certainly. I mean, under your argument, any sentence that does not allow the defendant to at some point return to society would be an error and would be reversible. Doesn't a trial judge consider that while he's considering the sentence? Certainly. A fair sentence and a fair trial fact has to take that into consideration. And Miller, you're right, Miller v. Alabama never said that natural life sentences are improper. They could be proper in certain cases, but we need them to take into consideration the various factors without letting unverified statistics or personal beliefs or donning the hat of a prosecutor invade the province of sentencing. If there are no further questions, Your Honors, I would just like to end by asking this Court to give Michael what has eluded him thus far, and that is a fair hearing. And therefore, we request that he be able to vacate his guilty plea or alternatively a remand for a new sentencing hearing. Thank you, Ms. Devine. May it please the Court, Counsel. Your Honors, what brings us here is defendant's actions on May 10, 2007, when he made good on a prior threat to kill Jerome Craft. And in a classic textbook case of premeditated murder, he obtained a gun, he obtained a hoodie to disguise himself, and he went purposely to the corner of 103rd and Halsted to wait for a bus that he knew Jerome would be on, along with many other students departing Julian High School. When that bus approached the intersection, defendant acted. He moved up to the bus to make sure Jerome was inside, and when he saw what he was, he sprinted to the bus and he unloaded gunfire at all the unsuspecting passengers inside. And he struck five high school students, he killed one student, Blair Holt, and he injured four other students. He ran away and he told his friends he laid the murder game down. Almost two years later, defendant entered blind pleas of guilty to two counts of first-degree murder and two counts of aggravated battery with a firearm. It wasn't the trial court that forced defendant to plead guilty to two counts of first-degree murder. Defendant himself brought it to the court that he was pleading guilty to intentional and knowing probability, both with a firearm. The trial court conducted a plea hearing that was fair and a sentencing hearing where defendant ultimately was sentenced to 100 years in prison. The trial court properly exercised its discretion when it denied defendant's motions to plead guilty to two counts of first-degree murder. I'm going to ask you to comment that that amounts to a life sentence and that couldn't possibly be fair. I mean, she didn't use those words, but that was the substance of it. What do you say to that? Well, I say that the trial court made it clear that he was considering all the statutory factors and all the factors in aggravation and mitigation and exercised his discretion and the fact that defendant might end up with a very lengthy time or in fact his whole life in prison doesn't mean that he has a mandatory minimum of life in prison. There are avenues for him to obtain his freedom if he obtains executive clemency and the penalty in this case fits the crime. As to defendant's arguments that  the trial court made clear that he was considering all the  mitigation and exercised his discretion and the fact that defendant might end up with a very lengthy time or in fact his whole    life in prison doesn't mean that he has a mandatory minimum of life in prison. As to defendant's arguments that the trial court made clear that he was considering all the statutory factors and all the factors in  the fact that defendant might end up with a very lengthy time or in fact his whole life in prison doesn't mean that he has a mandatory minimum of life in prison. We have a defendant who in effect enters a blind plea. So in effect he's really throwing himself on the mercy of the court. And we have a jurist who responds by saying I have to say as a matter of fact that I'm weary, tired of watching doctors, psychologists walk into my courtroom and somehow try to provide some shape for the conduct of a person like Michael Pace. It's a disservice to all the people they see during the course of their careers. Is that the impartial judicial consideration that we should give countenance to? Well, I think that you cannot just rely just on the trial court too much. There are many other quotes I could take from this record. Well, you have to remember that Dr. Hanlon did testify to the things that defendant faced academically, but a lot of that testimony did not really diminish the actions that defendant committed on May 10th. And the trial court went to great lengths to explain all the reasons for its sentencing and its remarks that it found Dr. Hanlon's testimony not substantially mitigating were part of the exercise of the case. While we're talking about the same issue, there is a, you know, the judge did say that he was considering a lot of things including the defendant's right to allocation of which he did not avail himself. And of course we realize the defendant has a right to remain silent. Correct. So how does that explicit comment by the judge not create some error here? Well, the judge later clarified that he didn't, that even though he commented on that, that was not a factor in its sentencing decision. So I don't have. So you're saying the judge sort of took it back? Yes. And that's good enough? Yes. Okay. The trial judge went to great lengths to explain that he had read the PSI that included all the information about defendant's background including his academic struggles and his upbringing, his gang affiliation. He knew that he didn't have a prior record. The trial court also knew the defendant, that information was contained that he used alcohol and marijuana. The trial court also heard the aggravating evidence from Detective Moss and two of the gunshot victims, Christina Colley and Megan James. The trial court heard the victim impact statements from Blair Holt's parents. It did consider the evidence and mitigation from Dr. Hanlon. It just didn't weigh it very sufficiently given that it pertained primarily to defendant's academic struggles. It did consider the fact that defendant entered a blind plea, the impact of incarcerating defendant for a long time. It considered the arguments in aggravation and defense counsel's arguments where defense counsel really emphasized defendant's low IQ and youthful age. But the trial court stated, and it's in accordance with well established law, that the facts of this crime weighed primarily the most heavy and that's what was the determining factor for its sentence. And where the trial court has stated explicitly what its reasons were for the sentence, his anecdotal remarks and his reflections on what he had heard at this sentencing hearing where he saw the evidence of the shooting and he heard from the victims and he heard from defense counsel, those remarks do not somehow establish that there was a secret reason for the trial court's sentence. And more importantly, they don't establish this animosity or ill will or unfair hearing. When Judge Ford questioned Dr. Hanlon, he was trying to establish the incongruity between his findings and this involvement in a gang and ultimately the expert did not provide evidence that harmed defendant. He said, you know, Judge, you're mistaking inability with impairment and it was probably because of his impairment that he ended up in a gang. And that didn't hurt defendant or the trial court did not use anything that he elicited that turned out to be aggravation. And the same is true with the trial court's questioning of Dr. Grossman. Now, at the hearing on the motion to vacate the guilty plea, these comments have to be considered in the context of these proceedings. Judge Ford was the judge who took defendant's plea, who had heard Dr. Hanlon's testimony and read Dr. Hanlon's report. And then at the motion to vacate the guilty plea, Dr. Grossman, who never interviewed defendant and stated that she based her opinion that defendant was incapable of understanding his testimony and also read to him at the same time, was based primarily on Dr. Hanlon's testing and raw data. Yet defense counsel pointed her, as her basis, to one portion of Dr. Hanlon's report where he had examined defendant for five domains of functioning, pointed the doctor to remark about defendant's verbal encoding impairment regarding defendant's memory. And from that she extrapolated that defendant could not understand the admonishments. Even though those findings were contrary, these are two defense experts. It isn't as if the trial court is questioning a defense expert about a state expert. But Dr. Hanlon found that defendant had extremely poor reading skills, yet was capable of understanding language and following directions and straightforward information. So the incongruity is what led the trial court to ask several questions. And this case is not like Jackson because the trial court here did not repeatedly interrupt cross-examination and direct testimony. He waited until the questioning was done and then he asked questions. And then when there was redirect and recross and then he asked questions. And our position would be that Jackson does not hold that a trial court or that this trial judge, just because it's the same judge, can never inquire when they have questions or that they assume a role of prosecutor merely because they do ask questions. Because ultimately the trial court was trying to get at the basis of Dr. Grossman's findings, why defendant was not capable of understanding the admonishments unless they were also in writing, when there was information that defendant had very poor reading skills. As to the guilty plea proceedings, defendant has the burden of demonstrating that his plea was not knowing and voluntary based on the existing circumstances at the time of the plea and judged by objective standards. So this court should consider the entire record when it's deciding whether defendant's plea was knowing and voluntary. And here the trial court did give, it substantially complied with Rule 204, 402, pardon me, when it told defendant the nature of the charges he was facing, that he had a right to plead not guilty and persist in his plea, and that if he pled guilty he'd be waiving all his rights to trial, the trial and all the rights that went with it, including right to confront witnesses against him. And they provided the minimum and the maximum for each sentence, first degree murder, the firearm enhancement, and two counts of aggravated battery. Where the trial court's admonishments might have fallen short of being perfect is that the trial court did not say to defendant that the sentences were consecutive. Even with this omission, the admonishments substantially complied with Rule 402 for all the remaining provisions. Well, doesn't that in and of itself take that outside of being reasonable? The fact that he didn't admonish as too consecutive or concurrent? No, not in that... How old was he at the time? He was 18 years old at the time. So you've got an 18-year-old and you're not telling him what concurrent means? No, you're not. He was represented by counsel and he did. The trial court did. The rule requires substantial compliance and not perfect. And there's no question that the trial court provided information about each discrete sentence that defendant was facing. And that is substantial compliance. There's maybe one portion missing, but that doesn't mean not substantial compliance. It merely means there wasn't perfect admonishments. Realistically, I wager to say there's a good share of adults out there that wouldn't know the difference between concurrent and consecutive unless spelled out. So doesn't that in and of itself take it out of being substantial compliance? My position is no, it does not, especially under the facts of this case where you have a defendant who is entering a blind plea. Doesn't that belie just natural, realistic judgment? No, not based on the facts here. We know that defendant The eventual outcome is you're either going to be going for, what, 20 years or up in the 60s? 57, was it? Well, he was advised, number one, he was entering a blind plea. Number two, he knew he could face up to life in prison. That was clear. His examination by Dr. Henry established that he knew that he was doing that. And also defendant did have different post-plea counsel and he did, well, he did assert this claim. There's never been anything other than this wasn't a perfect admonishment. There's never been any claim that there was mistaken or misapprehension or a reliance on this. And his post-plea counsel did file a 604D certificate stating that he had reviewed everything and taken defendants and consulted with defendant. And the presumption is that post-plea counsel was presenting everything that it could to establish that the plea wasn't knowing and voluntary. The primary focus of the plea was that defendant wasn't capable of understanding. But the real fall to admonishments here were there was substantial compliance. And absent objective or subjective evidence that defendant improperly relied on them or there was some misapprehension, then the guilty plea should be affirmed. Would your honors want me to address the constitutional? You've got about ten minutes, at least ten minutes left. Okay. I think I've addressed that the trial court properly exercises its sentencing discretion based on the facts of these cases. And Patterson forecloses defendant's constitutional claims to the mandatory minimum, which defendant did not get a mandatory minimum. Defendant got a sentencing hearing where a trial court exercised its discretion and provided and imposed sentences that were well within the statutory parameters and they're presumed valid. And defendant hasn't really established, despite, for lack of a better word, hyperbole and exaggeration about Judge Ford's comments. The judge stated the reasons for its sentencing. He did make anecdotal remarks that reflected the sentencing evidence that it heard and also basically statement of facts that we as a society should not allow a small percentage of criminals or gang members to make society worse for the rest of law-abiding citizens. And given the facts of the sentencing hearing and what the trial court heard and saw, it would require a real lack of compassion and sensitivity to merely state, I've considered the sentencing factors and I've not considered anything that isn't proper. And the trial court here plainly stated its reasons for sentencing and his other remarks. Had he done that, he probably wouldn't be here, right? Had he been very circumspect in his comments as just as the Lord pointed out and just basically saying, I've considered everything that I should have and I haven't considered anything that I shouldn't have, then there would be nothing to argue about, would there? So maybe the lesson there is that less is better. Well, it's just the comments. I'm not expecting you to answer that. Less is usually more, but in this case, the defendant cannot show that the sentencing was based on improper factors, not given what the trial court stated as its reasons, and there's no reason for finding that the trial court was being untruthful in those reasons. For these reasons and the reasons in our brief, the people respectfully request this court affirm the trial court's decisions that denied defendant's motion to vacate his guilty pleas and reconsider sentence. Thank you. Thank you, Ms. Nenna. A reply argument by Ms. Nenna. You know, the end result of this trial may have been a just result, probably a just result, but are the errors so grave in the court's consideration during sentencing that maybe what we would think is a just result should be brought back to the trial court? I believe the answer to that is yes. Why? Because, first of all, I take issue with any hyperbole or exaggeration on our part at all. Judge Ford's comments speak for themselves. Judge Harris, you repeated some of those comments, some of the worst comments, and he repeated those comments of the motion to reconsider sentence both before and over by this limited remand. Rather than allay our concerns that his sentence was not improperly based, he continued to reference the millions of children that allegedly have the same disability that Michael has. Then at the limited remand hearing, again, he referred to the men and women. And we must remember everyone at Supreme Court and people we damn around tells us if it's on his lips, if it's on the judge's lips, it's on his mind. Rather than allay us at all, we keep hearing about these comments. Just a few other points to, if I've answered your question correctly, fully. Okay, thank you. Also, I'd like to just point out that Judge Ford did, in fact, rely on the improper evidence that he elicited from Dr. Grossman. For example, he asked her about whether she had interviewed Mary Danahy, the public defendant who represented Michael, to learn what he knew at the time of the proceedings, at the sentencing here, the guilty plea proceedings or sentencing, to know what his understanding was. But that is a separate consideration. The question was whether Michael had the capacity to understand the guilty plea proceedings, given his intellectual disabilities, not what the judge told him or what anybody else told him. And then he went and relied on that in discrediting Dr. Grossman's testimony. So we would say, no, in fact, he did exactly the kinds of things that he did in Pupil v. Charles Jackson, almost to a tee, some of those questions were. And the fact that he waited until after defense and the state had questioned the witness doesn't change the fact that he repeatedly interrupted Dr. Grossman, that he criticized her for not answering simple questions, that he characterized the crime when talking to Dr. Hanlon as complicated, absent any evidence. And I don't think that my opposing counsel said the reason for the questions of Dr. Hanlon was because he wasn't apprised of the facts. But that's not my reading of the record. Dr. Hanlon interviewed this witness, had read, looked at the PSI, looked at everything. So I simply don't see that in the record myself. And just to get to your point, Justice DeLort, you mentioned about the reliance on the failure to avail himself of elocution. Judge Ford, in fact, in the motion to reconsider sentence, added further concerns when he said, elocution or no elocution, my sentence was going to be the same. Rather than alleviate those concerns, he's just adding to it. And it's notable that the public act which just went into, or will go into effect, notes that a court shall not consider a lack of expression of remorse as an aggravating factor if it's on the advice of counsel. And in this case, Ms. Danahy made very clear that Michael did not speak because of her advice. But what is evident in the record is that he tried to commit suicide. And that's not just counsel's remarks. That was contained within the PSI. And that alone also indicates an expression of remorse on Michael's part. And what's the public act number you're referring to? I am referring to Public Act 9969. Which will go into effect January 1, 2016. And just touching back upon the Getty plea, the proceedings themselves, no substantial compliance. We simply that's the rule here. A court is required to substantially comply. And our position is he doesn't substantially comply when he fails to tell a defendant that the mandatory minimum he faces is 57 years. Or that he faces consecutive sentences. We're not asking you to extend the law beyond what it already allows. The law provides this relief already. I believe the case is not on the top of my head, but the case law is right there. Illinois Supreme Court Rule 402 dictates. And finally, I don't think there's any position for Patterson foreclosing on as-applied challenges. I think that the people v. Romar Gibson got it right. Those as-applied challenges survive. Nobody would say a 100-year sentence as applied to a juvenile defendant with a diminished IQ is necessarily not unconstitutional. Thank you, Your Honors. If there's nothing else, we again ask that you vacate the guilty plea or alternatively remand for a new sentence. Thank you, Ms. Nevaeh. The Court will take the case under advisement. The Court will recess for a few minutes to allow the room to clear before we call the second case.